**UNITED STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION**

**STEPHEN TALBOTT, JR.,
KRISTIN WEBB, SHARON
OAKES, ERICA ROBERTS,
STACY D. KIRKSEY,
CALLIE GRAY-BOBBITT,
BETH MAROON,**[1]

              **Plaintiffs,**

**v.**                                              **Case No. 3:06cv378/MCR/MD**

**LAKEVIEW CENTER, INC.,**

              **Defendant**.
_____/

## ORDER and JUDGMENT

    Stephen Talbott, Kristin Webb, Sharon Oakes, Erica Roberts, Stacy Kirksey, Callie Gray-Bobbitt, and Beth Maroon (collectively "the plaintiffs"), have filed this case under the Fair Labor Standards Act of 1938, as amended, ("FLSA"), 29 U.S.C. §§ 201-219, alleging that their employer, Lakeview Center, Inc. ("Lakeview"), willfully failed to pay them overtime compensation for hours they worked in excess of 40 hours per week.[2]  *See* 29 U.S.C. §§ 207(a), 216(b).  They seek compensation for unpaid overtime together with liquidated damages.  Lakeview argues the plaintiffs are professionals exempt from overtime pay under the FLSA, *see* 29 U.S.C. § 213(a)(1).  Lakeview further argues that even if entitled to overtime pay, the plaintiffs should not be awarded liquidated damages because it acted

---

[1]  Lisa McLellan and Gennifer Geno also were listed initially as plaintiffs.  They each stipulated to a dismissal with prejudice pursuant to Federal Rule of Civil Procedure 41(a)(1).  (*See* docs. 44 & 73.)

[2]  The plaintiffs originally brought this suit in state court, and Lakeview removed it to federal court pursuant to 28 U.S.C. § 1441(b).

in good faith when it classified them as exempt professionals.[3]  *See* 29 U.S.C. § 260.  The case was tried to the court from July 20, 2009, through July 23, 2009.  The parties filed their proposed findings of fact and conclusions of law on October 26, 2009 (*see* docs. 322 & 323).  The court now renders its findings of fact and conclusions of law pursuant to Federal Rules of Civil Procedure 52(a)(1).

**Findings of Fact**

In December 2001, Lakeview entered into a contract with the Florida Department of Children and Families ("the DCF") to provide child welfare services, serving as the FamiliesFirst Network of Lakeview, a community-based care program established pursuant to Florida law.[4]  Pursuant to the contract, the DCF refers families from a four-county area who are in need of services to Lakeview.[5]  Lakeview's contract as a FamiliesFirst Network provider gives Lakeview the primary responsibility to "ensure the safety and permanency of the child" by providing, among other things, the delivery of child protection services related to adoption, foster care, in-home protective services, family reunification, family preservation, and case management.  (Lakeview's Contract, Def. Ex. 288, at 13.)  To this end, Lakeview employs supervisors and caseworker staff, designated as Family Services Counselors ("FSCs") or Foster Home Licensing Counselors ("FHLCs"), to perform casework management services that aid children who are in need of protective services, as well as their families and caretakers, foster home families, and families applying to be licensed as foster home providers.  At various times throughout the period of 2002 through 2006, the plaintiffs were employed by Lakeview as caseworker counselors.  Stephen Talbott, Kristin Webb, Erica Roberts, Stacy Kirksey, Callie Gray-Bobbitt, and Beth Maroon

---

[3]  Lakeview withdrew its claim of absolute immunity.  *See* 29 U.S.C. § 259.

[4]  "'Child welfare services' means any intake, protective investigations, pre-protective services, protective services, foster care, shelter and group care, and adoption and related services program, including supportive services, supervision, and legal services, provided to children who are alleged to have been abused, abandoned, or neglected, or who are at risk of becoming, are alleged to be, or have been found dependent pursuant to chapter 39."  Fla. Stat. § 402.40(2)(a).

[5]  Lakeview serves children and families in the counties of Escambia, Santa Rosa, Okaloosa, and Walton in northwest Florida.

were employed as FSCs, and Sharon Oakes worked as an FHLC.

The process of identifying families in need of child welfare services begins with an investigation by a DCF protective investigator into allegations of child abuse or neglect. The protective investigator initiates the intervention of services by referring the family to a casework counselor supervisor with a FamiliesFirst Network provider, such as Lakeview. An early services intervention meeting ("ESI staffing") is then arranged between the protective investigator, the casework counselor supervisor, and other individuals significant to the case, such as family members and FSCs or FHLCs assigned to the case. The purpose of the meeting – and early intervention in general – is to permit the casework counselor supervisor and either an FSC or an FHLC to begin arranging for services to aid the family while the DCI protective investigator continues the investigation and completes reports as necessary to a proper disposition of the case. The goal of all involved in the process is to develop a case plan specifying the efforts needed to achieve safety and "permanency" for the child.[6]

FSC Job Duties and Educational Prerequisites

The job duties of the FSCs involve working with families identified under Florida law as being in need of services to prevent future abuse or neglect of children. The primary duties of an FSC, as articulated in Lakeview's job description and testified to by the plaintiffs, include face-to-face contacts and home visits for the purposes of observing the children to ensure their safety; gathering information about the children and their home environment through interviews with the children, parents and caregivers; assessing the risks to children; working with others to develop a case plan geared toward reuniting the family; and identifying and addressing various needs of the family. When first assigned a case, the FSC contacts the family and performs an initial family assessment, which includes interviewing family members, gathering history and attempting to identify needs.

---

[6] Permanency is "[t]hat condition under which a child can remain in a setting for the remaining years of the child's minority. Permanency can include, but is not limited to, reunification with parent(s), long term foster care, . . . guardianship, adoption, independent living, or long term relative/non-relative custody." (Def. Ex. 288, at 11.)

The FSC drafts the case plan based on the initial assessment, the DCF protective investigator's dispositional study, and a "staffing," or meeting, with the FSC's supervisor, other service providers, and the DCF protective investigator. Thereafter, the FSC meets regularly (at least once a month) with families to discuss the case plan progress with the parents, check that they are obtaining necessary services or treatment from the service referrals recommended in the case plan, resolve any case-related emergencies (i.e., counselors are trained to call an abuse-hotline and report suspected abuse), and ensure the children are safe. The frequency of the home visits depends in part on the perceived level of risk to the children in the home.

After each visit, the FSC completes a home visit template, or "chronological note template," recording observations and checking the appropriate box assessing the risk in the home as low, medium, or high, which is then submitted to a supervisor. The supervisor and FSC discuss the observations, and if the risk is deemed high, the supervisor may instruct the FSC to prepare a safety plan based on their discussion of the case. FSCs are sometimes called on to prepare reports for the court in conjunction with a supervisor and other team members and to testify in court proceedings regarding the nature of the case, its management, and the extent of the parents' compliance with the case plan. The FSC attends case staffings with a supervisor monthly, permanency staffings with a supervisor and team every three months, and the case itself is subject to judicial review every six months. The FSC prepares forms in preparation for case staffings and permanency plan staffings, all in coordination with a supervisor. FSCs also perform routine tasks, such as transporting children and families to various appointments and entering case information into a web site known as Home Safe Net. They do not provide therapy to clients.

Before being permitted to recommend any change in a child's placement, either to remove a child from a current placement or return the child home, the FSC must complete a "risk assessment worksheet," documenting observable information, reporting any history of abuse or neglect, noting any patterns of maltreatment of the children, and outlining the experiences and personal history of the adults in the home. The FSC assesses parenting

capabilities and evaluates pertinent "stressors" on the family to make an assessment of the level of cooperation expected from the parents and evaluate the effectiveness of services already provided. After completing this worksheet, the FSC meets with a supervisor and team manager before making any recommendation regarding the child's placement. The report must be signed by the FSC and also a supervisor. The FSC acts not simply act as a scrivener to record a supervisor's assessment of the situation, but as an integral part of the assessment itself, offering necessary fact gathering and opinion based on the varying facts of each situation. Notwithstanding, all of the FSC's written work is subject to supervisor approval.

The plaintiffs testified consistently with one another regarding their specific job duties as FSCs. Kristin Webb had worked previously as an FSC for the state of Florida, and then worked for Lakeview first as an FSC and later as a supervisor.[7] She testified that case plans are prepared after discussions between the FSC, the family, and the child protection investigator; the FSC types up the plan which then is reviewed by the supervisor. Webb testified that FSCs gather information, which is then discussed with the supervisor who ensures that the correct referrals are made and also provides instruction for case management. The FSCs assess risk with the approval of a supervisor but have no independent authority to change a risk level. Callie Gray-Bobbitt testified she would discuss her observations with a supervisor and then complete safety plan forms and case staffing forms as instructed. Stacy Kirksey testified that she would discuss with a supervisor what should be included in the case plan prior to drafting it on the provided form. Beth Maroon emphasized the amount of time she spent simply transporting children and families and that her duties were micromanaged by a supervisor. The plaintiffs testified that FSCs have no authority to deviate from the plan or referrals on their own judgment without a supervisor's approval. This testimony fairly shows that while FSCs provide input and make recommendations regarding case plans and other reports based on their observations and assessments, the final case permanency plan is a team effort

---

[7] Webb testified that when she worked as an FSC for the state of Florida, she received overtime pay.

subject to the approval of the FSC's supervisor, the team, and ultimately the court.

Lakeview's FSC job description requires a bachelor's degree in "social services" or a related field. Additionally, FSCs must possess strong written and verbal skills, word processing skills, and a valid driver's license. Prior to taking responsibility for a caseload, FSCs must successfully complete and be tested on Phase I of Lakeview's two-part training program, entitled "Introduction to Child Protection." Phase I consists of six to eight weeks of largely classroom-based instruction with some field-based observation, covering topics such as interviewing techniques, writing case plans and other reports, training on detecting and preventing child abuse, inspecting homes for hazards, and dealing with emergencies. Phase II requires each FSC to obtain a satisfactory field-based assessment of actual casework within the first year of employment. Completion of both components of this training results in the issuance of a certificate from the Florida DCF conferring certified Child Protection Professional status for the counselor.[8] Lakeview hires individuals in a trainee or probationary status for up to one year until these mandatory training requirements are met. Thereafter, the FSCs are expected to attend continuing education activities required by Lakeview and as necessary to maintain their state certification. Lakeview acknowledges that during the initial training process, employees hired for the FSC position are considered nonexempt from overtime pay.

FHLC Job Duties and Educational Requirements

An FHLC is a type of family services counselor whose casework consists of facilitating foster home licensing by providing guidance, training, and support for foster home families with the safety of the child as the primary objective. At Lakeview, the FHLC's duties include assisting in recruiting foster families, coordinating training for prospective foster care families, developing and completing relicensing efforts, providing on-going training and guidance to licensed foster families, visiting potential foster families

---

[8] There are different types of child protection certification for counselors and supervisors. The DCF establishes the training and testing requirements for each type of certification, and individuals employed by Lakeview must meet the certification requirements for their position within the time specified. Lakeview requires certification as a Child Protection Professional within one year of employment.

in their homes, and completing home studies. The FHLC conducts background checks and interviews of parents and other adults present and observes the home to assess potential safety risks to children in the home. The FHLC then prepares a safe home study form for each home with a recommendation for approval or disapproval of the license. The FHLC prepares relicensure home study reports and recommendations prior to the renewal of any foster home license. Additionally, the FHLC leads "Model Approaches to Positive Parenting" (MAPP) training for foster home parents at least three times a year; participates in the quality review of all licensing records and processes; and coordinates with case management placement staff regarding appropriate homes for specialized placement needs.

Oakes testified that, as an FHLC, she performed these tasks and also prepared over-capacity waivers, which are required to permit a foster home to add another foster child beyond the number allowed by its current license. When a family requested this, she would gather the relevant information, identifying both positive and negative factors relevant to the decision based on her own assessment and observations, and report the information to her supervisor. Oakes would then draft the waiver as instructed after conferring with her supervisor. Oakes had worked two years previously for the Children's Home Society (which was a contract provider with the state of Florida) as a foster care licensing counselor, a family services counselor and as a supervisor. She testified that those positions were salaried, exempt positions but that she did not actually work any overtime hours while employed with the Children's Home Society. She also testified that she had previously worked in similar positions for the state of Florida DCF (eight years) and the state of Indiana (eight years) and had received overtime pay in both positions.

According to Lakeview's job description, the FHLC position requires a bachelor's degree, with no particular field of emphasis, plus one year of experience working with children and families in a foster care or case management environment, which need not be post-degree, and the ability to make presentations and provide training to large groups. Additionally, the FHLC must successfully complete Phase I of the child safety certification

training and MAPP training (which the FHLC will in turn present to foster families). The FHLC also is required by Lakeview to attend continuing education classes.

Lakeview's FLSA Exemption Determination

According to Lakeview, based on the job duties and educational requirements for these positions, FSCs and FHLCs are learned professionals exempt from overtime pursuant to the FLSA and its implementing regulations.[9]  *See* 29 U.S.C. §§ 207(a) & 213(a).  Sandra G. Whitaker, the vice president of career development and former human resources director at Lakeview, and David Barrera, Lakeview's employment compensation and benefits director, are responsible for monitoring Lakeview's state law and FLSA compliance.  They testified that Lakeview complies with all state regulations regarding child welfare services and, in particular, abides by the educational requirements when hiring staff members responsible for performing casework services, such as FSCs and FHLCs.  Lakeview's contract with the state of Florida requires it to ensure that "relevant staff" meet the qualifications and training or certification requirements for child welfare caseworkers as required by Florida law.  *See, e.g.,* Fla. Stat. §§ 402.731, 402.40 (requiring child welfare training); Fla. Admin. Code Ann. r. 65C-15 (degree requirements).

The Florida Administrative Code requires that staff members responsible for performing casework services shall have a bachelor's or a master's degree "in social work or a related area of study from an accredited college or university."[10]  Fla. Admin. Code Ann. r. 65C-15.017(3).  Whitaker and Barrera, who used the terms "social work" and "social services" interchangeably, testified that this regulation expressly permits Lakeview to

---

[9]  The overtime regulations relevant to this matter were significantly revised effective August 23, 2004. Whitaker and Barrera testified that Lakeview annually reviews each job for FLSA compliance and that they specifically considered the FSC and FHLC positions in light of the 2004 amendments to the federal regulations.  Lakeview reclassified two other positions as nonexempt at that time because they no longer met the revised salary requirements of the amended regulations.

[10]  By contrast, supervisors under Florida law are required to have a master's degree in social work or a related area of study from an accredited college or university and at least two years of experience in human services or child welfare programs, or a bachelor's degree in social work or related area of study and four years of experience in human services or child welfare programs.  Fla. Admin. Code Ann. r. 65C-15.017(2).

consider degrees in related fields.  According to Whitaker and Barrera, Lakeview relied on two opinion letters of the United States Department of Labor (DOL)[11] for guidance regarding what constitutes a related field.[12]  One DOL letter, dated January 24, 2001, addressed an employer's use of 30 semester hours of specifically named courses to meet a human behavioral science degree requirement, and the second, dated November 4, 2005, addressed a social worker job description requiring a master's degree in one of several enumerated fields, i.e., "social work, drug and alcohol, education, counseling, psychology, or criminal justice, plus two years of post-masters experience."  DOL Letter, Nov. 4, 2005 (FLSA2005-50).  Whitaker and Barrera stated they consulted these letters to determine the fields of study related to social work or "social services" and as a basis for considering the number of semester hours of specialized study plus years of experience sufficient to meet Lakeview's degree requirement.[13]  They further testified that they trained hiring personnel to consider first whether an applicant had a degree in "social services" or a related field, and if not, then to consider whether the applicant had a combination of related coursework and experience to render the applicant qualified.  The decision of

---

[11]  These DOL letters will be discussed in greater detail in the Discussion section, *infra*.

[12]  Lakeview has no written policy defining what constitutes a degree in "social services or a related field."

[13]  Barrera testified that he advised and specifically trained hiring staff to consider 30 hours of related coursework as a sufficient substitute for a degree in "social services or a related field."  At his deposition, however, Barrera made no mention of any number of hours of instruction or credit hours necessary to equal the degree requirement.  Contrary to his more specific trial testimony that he looked for 30 semester hours of related coursework, when asked in the deposition whether there were any particular requirements quantifying how much coursework in a related field was considered acceptable, he responded simply that it would depend on the experience and background of the individual.  Barrera also referenced the Florida administrative code (which requires a *social work* or a related degree) in his trial testimony and stated that Lakeview used the code as a guide for deciding which applicants were qualified, but he made no mention of this in his deposition testimony.  Barrera's trial testimony regarding the requirement of 30 semester hours was also inconsistent with Whitaker's trial testimony.  According to Whitaker, although Lakeview considered related coursework if an applicant did not have the required degree, no particular number of semester hours or credits were required.  Based on these unexplained discrepancies in testimony and on Lakeview's concession that no policy exists defining Lakeview's requirement of a degree in "social services" or a related field or what this means, the court accords little weight to Barrera's trial testimony that Lakeview required 30 semester hours of related coursework to satisfy the degree requirement.

whether an applicant was in fact qualified was thus left to the discretion of the hiring individual.

On two occasions, a DOL Wage & Hour Investigator determined that Lakeview's caseworker counselors did not exercise sufficient discretion and independent judgment to be considered exempt professionals within the terms of the FLSA regulations.[14] Lakeview provided the investigator with additional information regarding the caseworkers' actual job duties and requested that the investigator reevaluate the decision. There is no evidence in the record of any response from the DOL investigator, nor is there evidence of any further inquiry into the matter by Lakeview.[15] Whitaker testified she assumed Lakeview was in compliance because the DOL investigator made no further inquiry.

Plaintiffs contest Lakeview's determination that the FSC and FHLC positions fall within the learned professional exemption and at trial presented a chart prepared by Barrera listing 236 employees hired by Lakeview as FSCs and FHLCs between 2002 and 2006 and their relevant qualifications to show that the jobs in fact do not require a specialized degree within the meaning of the FLSA regulations. (*See* Plaintiffs' Ex. 11.) According to the chart, a majority of the employees possessed bachelor's degrees in social work and arguably related fields such as psychology, sociology, or criminal justice, but many employees hired did not. In Barrera's opinion, 210 of the 236 employees listed possessed a degree in the broad category of "social services" or a related field, 21 did not have the requisite degree or related degree but were qualified by a combination of coursework in a "social services" or a related field plus experience, and five were completely unqualified by Lakeview's standards.

Each of the plaintiffs has a bachelor's degree in what they admit reasonably can be considered to be in the field of "social services" or a related field (social work, child development, therapeutic recreation, or psychology), and with one exception, all plaintiffs

---

[14]  *See* 29 C.F.R. § 541.301 (stating the requirements to meet the learned professional exemption).

[15]  According to Whitaker, the investigator did not question Lakeview's educational requirements, only the job duties.

completed the necessary child protection training.[16] They each testified that the Phase I classroom instruction taught them how to perform their job duties, and the written assessment encompassed only material learned in the course, not during college. According to the offer letters admitted into evidence, each plaintiff was paid a yearly salary on a bi-weekly basis with a starting salary of at least $26,031 per year,[17] and their offer letter additionally listed their hourly rate of pay based upon a 40-hour workweek. (*See* Plaintiffs' Ex. 3, 5, 6, 8, 9.) The plaintiffs presented two job vacancy notices which stated explicitly that the FSC position was an 8 a.m. to 5 p.m. job, Monday through Friday. (*See* Plaintiffs' Ex. 4, 7.) All plaintiffs testified that they understood they would be required to work hours outside of a normal 40-hour work week due to the nature of the job and that they would not be paid overtime, but they also understood that they were expected to be at work during normal working hours five days a week. The plaintiffs occasionally were permitted to use flex time.[18] According to Whitaker, supervisors were permitted to

---

[16] Stephen Talbott left his job within five months so he did not finish the Phase II field assessment. Sharon Oakes and Kristin Webb had already completed the necessary training when they worked for the Florida DCF prior to their employment with Lakeview, and someone previously certified by the state of Florida as a child protection professional is not required to retake this training. The other plaintiffs took the child protection course and passed both Phase I and Phase II roughly within a year of obtaining employment with Lakeview, achieving certification as a Child Protection Professional.

[17] Gray-Bobbitt, Kirksey, Roberts, Talbott, and Maroon started at this level. Oakes and Webb had previously worked for the DCF and therefore started at a slightly higher pay grade. There is no dispute that they were all compensated on a salary basis at a rate of not less than $455 per week. *See* 29 C.F.R. § 541.300(a)(1). However, they were also informed of the hourly equivalent of their salary.

[18] Plaintiffs testified that occasionally after staying late they would receive permission to come in late the following day. For example, Sharon Oakes testified she used flex time for a few months during her employment with Lakeview as permitted by a supervisor. She said she had no expectation of overtime because she was offered flex time in her interview. Kristin Webb testified that she was told there was no overtime but she could adjust her schedule to come in late if she worked late. She said she took advantage of flex time on only a few occasions. When she worked as a supervisor, she permitted FSCs to use flex time within the two-week pay period; she testified that flex time was available until work hours dipped below 80 hours per pay period, and then personal or annual leave had to be taken. Stacy Kirksey was told during an interview that if she worked hours longer than an eight-hour day or over a 40-hour week, she could use flex time "to try and keep us more in line with what the job requirements were." Callie Gray-Bobbitt also testified that she understood hours flex time was available for over 40 if used within the two-week pay period; she was permitted to take advantage of this on only a few occasions. Erica Roberts testified she was sometimes permitted to use flex time and she understood it was an attempt to keep actual work hours close to 40 hours per week. Beth Maroon also testified that she was permitted to use flex time on occasion, but where her

authorize flex time to balance out the need for counselors to work hours outside the ordinary work day but that this was not intended to be an hour-for-hour exchange. In reality, the plaintiffs testified that, despite their understanding that flex time would be available, their use of flex time was infrequent due to the pressing and voluminous nature of their workload, and they were never permitted to leave early on their own determination that their work for the day was complete. The evidence demonstrates that the plaintiffs frequently, but not always, worked more than 40 hours a week and were not paid overtime.[19]

The plaintiffs brought suit to recover overtime pay under the FLSA, 29 U.S.C. § 207(a). There is no question Lakeview is an employer subject to the FLSA and the plaintiffs were not paid overtime. Lakeview argues that the plaintiffs are employed in a professional capacity, and as such, they are exempt from the overtime pay provisions of the FLSA. *See* 29 U.S.C. § 213(a)(1). The plaintiffs respond that they are not exempt because (1) they are not "learned professionals" within the meaning of the federal regulations, *see* 29 C.F.R. § 541.301, and (2) they are engaged primarily in safety and investigative work, similar to jobs expressly excluded from the professional exemption, *see* 29 C.F.R. § 541.3.

**Conclusions of Law**

General FLSA Standards

The FLSA was designed to eliminate "labor conditions detrimental to the maintenance of the minimum standard of living necessary for health, efficiency, and general well-being of workers." 29 U.S.C. § 202(a). To achieve this goal, the FLSA guarantees compensation for all work covered by the Act. *See Reich v. N.Y. City Transit*

---

hours reflect less than 40, she would have taken leave time. On cross-examination, however, she indicated that sometimes her flex time would result in less than 40 hours documented some weeks. Talbott testified that he used flex time for only a couple of months.

[19] In the pretrial stipulation (doc. 277), Lakeview admits that during their training, Stacy Kirksey worked 1.75 overtime hours on non-exempt training duties and Stephen Talbott worked 97.6 overtime hours on non-exempt training duties, for which Lakeview admits liability.

*Auth.*, 45 F.3d 646, 648-49 (2d Cir. 1995) (quoting *Tenn. Coal, Iron & R. Co. v. Muscoda Local No. 123*, 321 U.S. 590, 602 (1944)). This requires payment of overtime to employees for all hours worked in excess of a 40-hour workweek, at a rate not less than one and one-half times the employee's regular rate of pay. *See* 29 U.S.C. § 207(a)(1). An employee bringing a claim for unpaid overtime has the burden to demonstrate that she performed work for which she was not compensated. *See Harvill v. Westward Commc'n, L.L.C.*, 433 F.3d 428, 441 (5th Cir. 2005). Consistent with Congress's purpose, courts interpret the FLSA liberally in favor of the employee. *See Birdwell v. City of Gladsen, Ala.*, 970 F.2d 802, 805 (11th Cir. 1992).

Certain employees within this scheme, however, are exempt from the overtime pay requirement including, among others, "any employee employed in a bona fide executive, administrative, or professional capacity." 29 U.S.C. § 213(a)(1). The employer bears the burden to demonstrate the applicability of an exemption, and exemptions are construed narrowly against the employer. *See Jeffrey v. Sarasota White Sox, Inc.*, 64 F.3d 590, 594 (11th Cir. 1995); *Avery v. City of Talledega, Ala.*, 24 F.3d 1337, 1340 (11th Cir. 1994). The Eleventh Circuit "has recognized the Supreme Court's admonition that courts closely circumscribe the FLSA's exceptions," and the exemptions apply "only to those clearly and unmistakably within the terms and spirit of the exemption." *Morgan v. Family Dollar Stores, Inc.*, 551 F.3d 1233, 1269 (11th Cir. 2008) (internal marks omitted), *cert. denied*, 130 S. Ct. 59 (2009); *see also Birdwell*, 970 F.2d at 805 (requiring proof of an exemption by "clear and affirmative evidence" (internal marks omitted)). Although the inquiry into whether the professional exemption applies is extremely fact bound and case specific, *see Rutlin v. Prime Succession, Inc.*, 220 F.3d 737, 740 (6th Cir. 2000), the court focuses on the duties and requirements of the occupation, not the personal qualifications of the employee, because the exemption applies to employees who are "*employed* in a bona fide . . . professional capacity." 29 U.S.C. § 213(a)(1) (emphasis added); *see Dybach v. State of Fla. Dep't. of Corr.*, 942 F.2d 1562, 1565 (11th Cir. 1991). Whether the occupation's duties meet the exemption and exclude an employee from FLSA overtime pay is a question of

law. *Icicle Seafoods, Inc. v. Worthington*, 475 U.S. 709, 714 (1986).

Professional Capacity Exemption

The professional capacity exemption is defined by the implementing federal regulations, as delegated by Congress.[20]  *See* 29 C. F. R. Ch. V, Part 541.  These regulations were amended effective August 23, 2004, and the claims presented in this case straddle both sides of that date.[21]  However, having considered both the pre-amendment regulations and the amended regulations, the court concludes that the ultimate determination of whether the professional capacity exemption applies to this case is the same under either version, and the parties do not contend otherwise.[22]

_____

[20]  The court gives controlling weight to the agency's interpretation of the statute unless the regulations are "'arbitrary, capricious, or manifestly contrary to the statute.'"  *See Dybach,* 942 F.2d at 1565 (quoting *Chevron, U.S.A., Inc. v. Nat'l Res. Defense Council, Inc.*, 467 U.S. 837, 844 (1984)).  The parties have not argued that the regulation is arbitrary, capricious, or contrary to the statute, so controlling weight is due.

[21]  The plaintiffs' employment dates are as follows:  Callie Gray-Bobbitt – December 2002 through January 2006; Erica Roberts – May 2002 to June 2005; Kristin Webb – June 2002 through March 2006; Sharon Oakes – February 2003 through February 2006; Stacy Kirksey – October 2003 through December; and Beth Maroon – July 2004 through March 2006.  Stephen Talbott was employed with Lakeview only after the amendments – May 2005 through January 2006.

[22]  The parties stipulated that the FLSA regulations effective on August 23, 2004, apply to this case because they became effective before the dates the plaintiffs terminated their employment with Lakeview and before the filing of this action.  Parties may not stipulate to the applicable law, *see Tomlinson v. Orange County, Fla.*, 785 F.2d 933, 935 n.2 (11th Cir. 1986), and thus the court has independently considered this issue.  Regulations do not apply retroactively without explicit authorization, and none exists here.  *See Kennedy v. Commonwealth Edison* Co., 410 F.3d 365, 369 (7th Cir. 2005); Ramos *v. Lee County Sch. Bd.*, No. 2:04cv308, 2005 WL 2405832, at *2 n.4 (M.D. Fla. 2005) (unpublished).  It is therefore appropriate in this case to apply the preamendment regulations to claims for overtime pay prior to August 23, 2004, the effective date of the amendments, and to apply the amended regulations to claims for overtime after that date.  *See Morgan*, 551 F.3d at 1265-66 & n.48 (noting two sets of regulations apply where the claims straddle the effective date of the amendments); *see also Bergquist v. Fidelity Info. Servs. Inc.*, 399 F. Supp. 2d 1320, 1328-30 (M.D. Fla. 2005) (analyzing both sets of regulations to claims where claims spanned the effective date), *aff'd* 197 Fed. Appx. 813 (11th Cir. 2006) (unpublished).  Having considered both, however, the court is satisfied that the result here is the same under either.  The amendments appear to clarify and update the applicability of the exemptions, in many respects codifying existing case law interpreting the regulations.  *See Ramos*, 2005 WL 2405832, at *2 n.4.  The only substantive change relevant to this case is that the salary requirement was raised from $250 per week under the pre-amendment regulations to $455 per week, and there is no question the plaintiffs' salary exceeded both of these benchmarks.  Furthermore, the amended regulations did not change the educational requirements for the professional exemption.  *See Defining and Delimiting the Exemptions for Executive, Administrative, Professional, Outside Sales and Computer Employees*, 69 Fed. Reg. 22122 (Apr. 23, 2004).  The amended regulations may have clarified the applicability of the learned

At issue is whether the plaintiffs' occupations are within the "learned professional" prong of the professional capacity exemption.[23]  The learned professional exemption applies to employees compensated on a salary or fee basis in an amount not less than $455 per week and engaged in work where their primary duties involve "knowledge of an advanced type in a field of science or learning customarily acquired by a prolonged course of specialized intellectual instruction."  29 C.F.R. § 541.300(a)(1), (a)(2)(i).  There is no dispute here that the salary requirement is met, so the court will focus on the three elements of the primary duties test,[24] which the employer must demonstrate by clear and affirmative evidence:  (1) the employee's primary duty involves work requiring advanced knowledge, (2) the advanced knowledge is in a field of science or learning; and (3) the advanced knowledge is of a type that is "customarily acquired by a prolonged course of specialized intellectual instruction."  29 C.F.R. § 541.301(a); *see Birdwell*, 970 F.2d at 805 (reciting the "clear and affirmative evidence" standard); *see also Jeffrey*, 64 F.3d at 594 (acknowledging employer bears the burden of proof to demonstrate the applicability of an exemption).

The first element, "advanced knowledge," means the work is predominantly intellectual in character and requires the "consistent exercise of discretion and judgment, as distinguished from routine mental, manual, mechanical, or physical work."  29 C.F.R. § 541.301(b).  Advanced knowledge cannot be attained in high school and must be used by the employee "to analyze, interpret, or make deductions from varying facts or

---

professional exemption, but they are not substantively inconsistent with the preamendment regulations as relevant to this case.  For this reason, unless otherwise noted, this court's opinion will reference only the regulations as amended on August 23, 2004.

[23]  The professional capacity exemption also expressly applies to creative professionals whose primary duties involve artistic or inventive endeavors, *see* 29 C.F.R. §§ 541.300(a)(2)(ii), 541.302; teachers, *id.* § 541.303; and the practice of law or medicine, *id.* § 541.304.

[24]  Consistent with common understanding, the term, "'primary duty' means the principal, main, major or important duty that the employee performs."  29 C.F.R. § 541.700(a).  This may include consideration of the relative importance of the exempt duties as compared with other duties, the amount of time spent on exempt duties, or the employee's relative freedom from direct supervision. *Id.*

circumstances." *Id.*  Lakeview's job descriptions require a degree in "social services"[25] or a related field for the FSC position, and, for the FHLC position, a bachelor's degree (with no field specified).  Although the plaintiffs acknowledge their positions required the exercise of some discretion and judgment, they argue, however, that Lakeview has not demonstrated that the type of discretion they exercised required *advanced* knowledge because their work was subject to close supervision, and they obtained the knowledge necessary to perform their duties through the six- to eight-week Phase I training course.

The court finds that the primary duties of an FSC and FHLC, which involve assessment of the risks in a child's environment, ranging from physical dangers in the home itself to dangers resulting from various forms of abuse, neglect, or substance abuse on the part of the parents or other adults, require the exercise of some measure of discretion, subject to supervision.  In fact, all of an FSC's and FHLC's written work is subject to a supervisor's approval and, in the case of the FSC, is carried out in coordination with a case-management team.  All of the FSC's and FHLC's recommendations must receive supervisor approval before they may take action on them.  Their input and recommendations, which are based upon their first-hand observations and assessments of risk, are nevertheless critical components of the case-management and foster home licensing processes.  A position may be subject to some supervision and still require the consistent exercise of discretion and judgment within the meaning of the professional exemption.  *See Owsley v. San Antonio Ind. Sch. Dist.*, 187 F.3d 521, 526 (5th Cir. 1999) (athletic trainers acting under the supervision and direction of a team physician still exercising independent judgment), *cert. denied*, 529 U.S. 1020 (2000); *Reich v. Wyoming*, 993 F.2d 739, 743 (10th Cir. 1993) (game warden subject to some supervision still exercised a great deal of discretion); *Chatfield v. Children's Servs., Inc.*, 555 F. Supp.2d 532, 534-35 (E.D. Pa. 2008) (truancy prevention case manager found to exercise discretion though subject to weekly supervision).  For reasons that follow, however, the

---

[25]  No evidence was presented to show that "social services" is a recognized academic degree, and the court is not otherwise familiar with the term in any academic context.

court agrees with plaintiffs that although their positions required some exercise of discretion to "analyze, interpret or make deductions from varying facts or circumstances," 29 C.F.R. § 541.301(b), they were not exempt because the knowledge required to make these discretionary calls was obtained through the Phase I training, as discussed more fully in the court's discussion regarding the third element of the primary duties test, and was not the type of advanced knowledge sufficient to qualify for the learned professional exemption.

The second element of the primary duties test requires that the advanced knowledge be in a "field of science or learning." Fields of science and learning include traditional professions such as law, medicine, theology, engineering, teaching, chemical and biological sciences, to name a few, "and other similar occupations that have a recognized professional status as distinguished from the mechanical arts or skilled trades where in some instances the knowledge is of a fairly advanced type, but is not in a field of science or learning." 29 C.F.R. § 541.301(c). Generally, social work is a field of science or learning. *See Chatfield*, 555 F. Supp.2d at 535. It is unclear on this record how closely social work and "social services" are linked, but Whitaker and Barrera used the terms interchangeably.[26] Even if there had been evidence that they are synonymous, social work is a broad field encompassing varying practice areas and levels of specialty, and the level at which it is practiced will determine whether a particular position qualifies for the professional exemption. *See* DOL Letter Nov. 4, 2005 (stating social work practiced at the master's degree level requires advanced knowledge in a field of science or learning).

In this case, even assuming the duties of an FSC and FHLC call for knowledge requiring the exercise of discretion in a field of science or learning, applying the third element of the primary duties test, the court concludes that the knowledge in this instance is not the type of *advanced* knowledge that qualifies for the learned professional

---

[26] Despite Whitaker's and Barrera's use of the terms "social work" and "social services" interchangeably, there is nothing to support a contention that a "social work" degree is synonymous with a "social services" degree, or that Lakeview's requirement of a bachelor's degree in "social services or related field" equals the requirement of a *specialized* degree.

exemption. The third element is satisfied if the position requires "advanced knowledge" that is "customarily acquired by a prolonged course of specialized intellectual instruction." 29 C.F.R. § 541.301(a), (d). The plaintiffs argue that Lakeview's six- to eight-week Phase I training course provided them with the knowledge necessary to perform their jobs and that this is insufficient to meet the learned professional exemption's requirement of *advanced* knowledge. The court agrees. The learned professional exemption is restricted to jobs "where specialized academic training is a standard prerequisite for entrance into the profession." § 541.301(d). The regulation states, "The best prima facie evidence that an employee meets this requirement is possession of the appropriate academic degree." *Id.* Importantly, the learned professional exemption does not apply to occupations customarily "performed with only the general knowledge acquired by an academic degree in any field," or with knowledge that is gained either through an apprenticeship or other training in routine processes. *See id.* While the appropriate academic degree is generally the best evidence of whether the exemption applies, the actual degree held by the individual is not dispositive of this inquiry. According to the Eleventh Circuit, the critical question is whether performance of the particular job *duties* calls for "at least a college degree in a specialized type of learning." *Dybach*, 942 F.2d at 1565. "A college degree of a generalized type does not meet that requirement." *Id.* Ordinarily, then, where the job description does not require a degree in a specialized field, the position does not meet the learned professional exemption.[27] *See id.*

---

[27] The Eleventh Circuit in one unpublished case distinguished *Dybach* and looked to an individual's degree in circumstances where the job description did not specify an educational requirement. *See Stevins v. Provident Constr. Co.*, 137 Fed. Appx. 198, 199 (11th Cir. 2005) (unpublished); *see also* 11th Cir. R. 36-2 (stating unpublished opinions are not considered binding precedent but may be cited as persuasive authority). In *Stevins*, a construction supervisor who had a specialized degree and a builder's license was found to be exempt despite the lack of a formal degree requirement in the job description. However, it was not the individual's degree alone that satisfied the exemption but the fact that the job's primary duties required the use of advanced specialized knowledge. *See Stevins*, 137 Fed. Appx. at 199 & n.2. The court noted that the actual duties and requirements of the job called for a prolonged course of specialized learning, despite the lack of a degree requirement in the job description. *See id.* Thus, it remains appropriate to consider the degree requirement stated in the job description as the best prima facie evidence that the position is a learned profession, but the actual primary job duties ultimately control the inquiry where a specialized degree is not articulated.

For the FHLC position, Lakeview requires a bachelor's degree in any field and one year of "experience working with children and families in a foster care or case management environment," which the court finds too generalized to fall within the learned professional exemption. Lakeview asserts its FHLC job description is in fact governed by the state's requirement that staff responsible for caseworker services have a bachelor's degree in social work or a related field, *see* Fla. Admin. Code Ann. r. 65C-15.017(3); and that it hires in accordance with that standard despite its job description's failure to designate a social work degree. This is not entirely consistent with the evidence, however. The evidence shows that FHLCs hired between 2002 and 2006 had degrees in social work, counseling, psychology, sociology, recreational therapy, family and child development, management, and marketing. While most of these fields are reasonably related to social work, Lakeview's failure to insist that every FHLC have a social-work-related degree and to even mention a social work degree in its job description materially detracts from any assertion that a specialized degree is *required* to perform the duties of an FHLC.[28] *See Dybach*, 942 F.2d at 1566 (stating the lack of a requirement of a college or an advanced degree in any *specialized* field of knowledge precludes application of the learned professional exemption).

For the FSC position, Lakeview requires a bachelor's degree in "social services" (again, not social work) or a related field. For reasons that follow, the court concludes that this requirement likewise is too generalized and undefined to convincingly demonstrate that a specialized degree is required to perform the job. Lakeview first asserts that the degree requirement, like that of the FHLC, is in fact governed by the state regulations requiring caseworkers to hold a bachelor's degree in social work or a related field of study, and that this expressly permits Lakeview to consider "related" degrees. Again, the evidence is not entirely consistent. Although the evidence shows that a majority of FSCs employed during the relevant time did possess a bachelor's degree in social work or the related field of

---

[28] The court makes no judgment on whether Lakeview is in compliance with the state regulations. Only the FLSA professional exemption is at issue in this case.

psychology, a wide variety of other degrees are represented as well among applicants hired between 2002 and 2006, including sociology, criminal justice, criminology, social sciences, health education, elementary education, human environmental studies, alternative education, French education, therapeutic psychology, communication arts, special education, therapeutic recreation, health studies, family studies, history, religion, economics, accounting, management, public administration, Afro-American studies, political science, communications and business administration, religion, marketing, and math.  Even to a lay person's eye, clearly all of these degrees are not related to social work or "social services."

Despite the fact that Lakeview has no written policy articulating which degrees it considered "related" to social work or "social services," Lakeview argues that two DOL opinion letters provided it with the necessary guidance to make that determination.[29]  The January 2001 DOL opinion letter described two exempt caseworker positions, titled Social Caseworker II and Social Caseworker III.  The job descriptions for each position required either a master's degree in social work or human behavioral science, or a bachelor's degree with a major in human behavioral science.  In addition, the Social Caseworker II position required one year of post-degree professional caseworker experience, and the Social Caseworker III position required two years.  To meet the degree requirement, the employee was required to demonstrate at least 30 semester hours in *specified* courses of development of human behavior, family intervention techniques, diagnostic measures of therapeutic techniques such as social work, psychology, sociology, guidance and

---

[29]  The court considers the DOL opinion letters dated January 24, 2001, and November 4, 2005, and gives deference to the extent they are persuasive, bearing in mind that the opinions expressed in the letters are based exclusively on the facts and circumstances represented by the employer in a particular case.  *See Hogan v. Allstate Ins. Co.*, 361 F.3d 621, 628 n.8 (11th Cir. 2004); *see also Christensen v. Harris County*, 529 U.S. 576, 587 (2000) (noting opinion letters are not entitled to *Chevron*-style deference).  Where the agency is expressly delegated authority to make regulations defining the professional capacity exemption, the agency letter interpreting an ambiguity in the regulation is entitled to more deference.  *See Auer v. Robbins*, 519 U.S. 452, 461 (1997) (noting in the FLSA context that the agency's interpretation of its own regulations is "controlling unless plainly erroneous or inconsistent with the regulation" (internal marks omitted)).  The court finds the DOL's interpretations to be persuasive in this case but very fact sensitive and thus to be applied with caution to a new set of circumstances.

counseling, or child development. The explicitly articulated degree and coursework requirements present in these job descriptions stand in stark contrast to Lakeview's complete lack of any specification regarding what it considers sufficient for a bachelor's degree in "social services" or a related field. Moreover, there is nothing to corroborate Lakeview's assertion that it took guidance from this letter when making hiring decisions. Notably, Lakeview has no written policies designating any combination of specified and related courses, any number of hours of related coursework, or any level of experience that could combine to equal or substitute for the degree requirement.[30]

The November 4, 2005, DOL opinion letter specifically addressed a social worker position requiring a master's degree (considered exempt) and a caseworker position requiring a degree in social sciences (considered not exempt). The social worker position required a master's degree in social work or one of a handful of other *specifically enumerated* disciplines, including counseling, psychology, education or criminal justice, plus two years of post-master's degree experience. Lakeview asserts it relied on this delineation of academic fields related to social work to guide its hiring decisions. This assertion is difficult to accept. First, the court cannot overlook the fact that Lakeview did not articulate these related fields in its FSC job description. Moreover, Lakeview seemingly ignored the remainder of the factual context and conclusions of the November 2005 DOL letter, on which it purports to rely, wherein the DOL concluded that the social worker position requiring a master's degree was exempt but the caseworker position requiring only a "social science" bachelor's degree was not. Notably, the employees in these two positions "perform[ed] the exact same duties;" the sole distinction was the articulated

---

[30] Additionally, although the caseworker positions described in the January 2001 DOL letter, and considered to be exempt by the DOL, contained duties involving much the same work as the positions at issue here, the positions described in the letter gave more decision-making authority to the employee. For example, the caseworkers in the 2001 DOL letter were subject only to monthly or bi-monthly supervision and were permitted to make decisions regarding out-of-home placement. They also developed and recommended to the court an appropriate treatment plan, determined the permanency plan, and decided what actions were necessary in each case. In this case, the FSC and FHLC do not have independent authority to make those decisions; they make recommendations as part of a team effort, subject to supervisory input and approval.

degree requirement. The DOL letter distinguished the caseworker position for its lack of a requirement of specialized academic training, concluding that the required "social sciences" bachelor's degree was too general to be considered a prolonged course of specialized intellectual instruction but that social work practiced at the master's degree level qualified for the exemption. Although Whitaker testified that the "social science" bachelor's degree, which the DOL letter concluded was not specialized enough to satisfy the learned professional exemption, is different from Lakeview's requirement of a "social services or related degree," she could not articulate any meaningful distinction between them. Absent a distinction indicating some level of specialization in Lakeview's degree requirement, Lakeview's purported reliance on the DOL letter does little to advance its position. In fact, Lakeview produced no evidence to distinguish its degree requirement from social sciences or even to indicate that "social services" is a recognized academic degree as opposed to a broad category of degrees. Although the "social science" degree requirement discussed in the November 2005 DOL letter is a recognized academic degree, and a degree held by several Lakeview employees, the DOL considered it too general to indicate a prolonged course of specialized intellectual instruction. Lakeview's requirement of a bachelors degree in "social services or related field" fares no better – "social services," if a degree, is not a degree held by any Lakeview employee and the term "related field" Lakeview has left undefined. The wide array of degrees Lakeview has accepted as within this broad category, even excepting the five hirees Lakeview admits were unqualified, defies any assertion that a specialized degree is in fact a standard prerequisite for entry into the social work profession at this level.

Lakeview also asserts that even aside from the degree requirement, the FSC and FHLC positions are nevertheless properly categorized as exempt because those applicants hired without the appropriate degree had instead a qualifying combination of related intellectual study and experience.[31] To be exempt, the job must require *advanced*

---

[31] Whitaker testified that Lakeview considers experience and related coursework on an individual basis, but she further acknowledged that there are no particular semester hour requirements for determining whether the coursework equals the degree requirement. Although Barrera testified that he trained hiring staff

knowledge of a type that is "*customarily* acquired by a prolonged course of specialized intellectual instruction." 29 C.F.R. § 541.301(a), (d) (emphasis added). The regulation's use of the term "customarily" denotes that the exemption also applies to those in the profession who lack the specialized advanced degree but have "substantially the same knowledge level and [who] perform substantially the same work as the degreed employees, but who attained the advanced knowledge through a combination of work experience and intellectual instruction."[32] § 541.301(d). Consistent with the regulation, the Eleventh Circuit has recognized that some jobs are the product of rigorous study and serious intellectual endeavors even though the job description lacks a particular degree requirement. *See Dybach,* 942 F.2d at 1565-66 (discussing a Fifth Circuit case holding that a commercial pilot met the exemption despite the lack of a specialized degree requirement, *Paul v. Petro. Equip. Tools Co.*, 708 F.2d 168 (5th Cir. 1983)); *Stevins*, 137 Fed. Appx. at 199 (holding that a construction supervisor was exempt despite the job's lack of any formal educational requirements where the job duties required advanced specialized knowledge and the employee had a specialized degree). What distinguishes these cases from the instant one, however, is that performance of the primary job duties of an FSC or an FHLC does not in fact *require* a prolonged course of specialized intellectual study.

The type of knowledge necessary to perform the duties of the FSC and FHLC positions is gained by the employee in Lakeview's training course. The undisputed evidence shows that the Phase I training, not the plaintiffs' degrees or college coursework, prepared them for their jobs. Notwithstanding Lakeview's articulated degree requirements, it is clear from the evidence that the degree a Lakeview FSC or FHLC applicant brings to

---

to consider 30 semester hours of related coursework, the court has accorded little weight to that testimony due to the inconsistency with his deposition testimony in this regard and given the absence of any other evidence demonstrating that Lakeview actually considered this specific benchmark when making its hiring decisions. Thus, the evidence as a whole does not support Lakeview's assertion that where an applicant did not possess the requisite degree, it considered a certain level of related coursework as equal to the degree requirement.

[32] The example given in the regulation is the occasional lawyer who did not attend law school – a dated scenario that is unlikely to occur today. The example, however, amply demonstrates the type of recognized profession to which the exemption applies.

the job is not specialized enough to permit the new hire to assume responsibility for a caseload until the Phase I training is complete.[33]  For example, Kirksey, who had a degree in psychology with a concentration in child psychology, but no related experience other than one year of substitute teaching, testified that she did not know how to make the reports, evaluations and assessments necessary to her job as an FSC until taking the Phase I training nor did she know what to document as risks prior to her training at Lakeview.  The Phase I training instructed on the routine procedures necessary to perform the jobs, such as how to fill in forms, and also adequately provided the knowledge necessary to perform the discretionary job duties required of FSCs and FHLCs in varying circumstances.  The evidence demonstrates that this class is in fact the only specialized course required of every FSC and FHLC employed at Lakeview, and its successful completion is a prerequisite to taking on a caseload.

Because the Phase I training course is of short duration and more akin to on-the-job training than an advanced intellectual course of study, it plainly does not provide advanced knowledge of a type "customarily acquired by a prolonged course of specialized intellectual instruction" or "specialized academic training [that] is a standard prerequisite for entrance into the profession," as required for the learned professional exemption.  29 C.F.R. § 541.301(d).   The evidence demonstrates that this relatively short course can be completed successfully with only a general academic degree or one of several degrees related to "social services;" as concluded above, a specialized degree is not a necessary prerequisite for either position.  Indeed, the Phase I training is more akin to on-the-job training than to a prolonged course of specialized intellectual study.  "[T]he learned professional exemption is not available for occupations that customarily may be performed with only the general knowledge acquired by an academic degree in any field [or] with knowledge acquired through an apprenticeship . . . ."  *Id.*; *see also Fife v. Harmon*, 171 F.3d 1173, 1177 (8th Cir. 1999) (concluding that a position requiring a bachelor's degree

---

[33]  Only those hired with experience and prior certification – i.e., who had taken a Phase I-type course during their prior employment – were excused from the Phase I training.

Case No. 3:06cv378/MCR/MD

in aviation management or a directly related field, or four years of full-time experience in aviation administration, or an equivalent combination of experience and education "is advanced knowledge from a general academic education and from an apprenticeship, not from a prolonged course of specialized intellectual instruction"). Furthermore, Lakeview's practice of leaving to the discretion of each hiring individual the determination of which courses or how many semester hours of those courses could be considered equivalent to the degree requirement further illustrates that Lakeview itself did not consider a particular prolonged course of study in a *specialized* field to be necessary for the performance of the FSC and FHLC job duties. Based on the evidence, the court concludes that a general degree or a "social services" or related degree, as Lakeview has used the terms, plus a six- to eight-week on-the-job training class is not by any stretch the equivalent of a specialized degree or a prolonged course of specialized intellectual training.

The state certification that is awarded upon completion of the child protection training does not alter this analysis.[34] This certification is awarded simply upon successful completion of the Phase I six- to eight-week class and the Phase II field assessment, to be completed within the first year of employment. This stands in sharp contrast to other occupations in which a prerequisite for entry into the profession is a specialized state license achieved only after completion of a *prolonged* course of *specialized* study and experience. *See, e.g.,* 29 C.F.R. § 541.301(e)(1) (stating registered medical technologists meet the exemption after successful completion of three academic years of preprofessional study plus a fourth year of professional course work); § 541.301(e)(4) (stating physician assistants meet the exemption with four years of preprofessional and professional study and are certified by the National Commission on Certification of Physician Assistants); *see also, Rutlin*, 220 F.3d at 742 (holding a funeral director within the learned professional exemption where the occupation was licensed by the state, required one year of mortuary

---

[34] Whitaker testified that Lakeview believes the counselors are exempt at the time they are hired (Trial Tr. at 107), thus, Lakeview cannot credibly claim that the Phase I course alone provides the specialized academic training to qualify for the learned professional exemption.

science school, two years of college in specified courses, passing a national board test, and a one-year apprenticeship).[35]  Many skilled jobs require a state license but do not require a prolonged course of specialized intellectual study.  *See, e.g.,* 29 C.F.R. § 541.301(e)(2) (stating licensed practical nurses are not learned professionals).

The federal regulations acknowledge that the list of exempt professionals is ever expanding as knowledge and, correspondingly, new specialized academic training is developed. 29 C.F.R. § 541.301(f). Yet, an occupation found to be expanding in so far as the knowledge required to do the job does not take on the characteristics of a learned profession until either a new specialized degree or a new specialized curriculum and certification program has become a standard requirement for the occupation. *See id.* The court is not convinced that a six- to eight-week course culminating in a state certification, and which can be completed by someone with a general degree in "social services" or a "related field," terms left undefined by Lakeview, equals the type of specialization or prolonged course of intellectual instruction evident in the certification programs that are expressly listed in the regulation as meeting the learned professional exemption.[36] *See id.; see, e.g.,* §§ 541.301(e)(1) (stating registered or certified medical technologists generally meet the duties requirement of the learned professional exemption); 541.301(e)(3) (same for dental hygienists); 541.301(e)(4) (same for physician assistants).

Notably, the regulations expressly identify certain occupations that are beyond the scope of the professional exemption.  These include police officers, detectives, parole or probation officers, correctional officers, "and similar employees," whose work involves

---

[35]  The regulations now state expressly that funeral directors with these qualifications are generally exempt.  29 C.F.R. § 541.301(e)(9).

[36]  The Fifth Circuit has held that athletic trainers with a bachelor's degree in any field along with 1800 hours of apprenticeship over three years and 15 hours of college course in specialized subjects met the specialized training requirements for exemption, *see Owsley*, 187 F.3d at 525, but that emergency medical technicians not required to have a college degree, only 200 - 880 hours of didactic training, clinical experience, and field internships did not, *see Vela v. City of Houston*, 276 F.3d 659, 675 (5th Cir. 2001).  The requirement of a general degree plus the Phase I child protection training in this case lies somewhere in between, but far closer to the nonexempt positions, in the court's opinion.

preventing or detecting crimes, investigating violations of law, performing surveillance, supervising suspected and convicted criminals, interviewing witnesses, preparing investigative reports, "or other similar work." § 541.3(b)(1). These and "similar employees" performing "similar work" are not exempt professionals, regardless of their rate of pay or their educational background, because, although they may hold college degrees or certifications or licenses, "their primary duty is not the performance of work requiring knowledge of an advanced type in a field of science or learning customarily acquired by a prolonged course of specialized intellectual instruction." § 541.3(b)(4). These positions undoubtedly require rigorous job training (such as attending the police academy) before a hiree is qualified to perform the job duties, yet they are not exempt learned professionals. The FSC and FHLC perform similar work to these nonexempt jobs. Their primary duties of preventing abuse, assessing risk, interviewing families, and monitoring families to ensure they receive necessary services and are compliant with a case plan consist of work similar to that of a probation officer or correctional officer. At this level of social work, they are not providing therapy or counseling; they are observing, monitoring, assessing safety, and making recommendations to a supervisor, as trained in the Phase I course.

Lakeview has not met its burden to clearly and convincingly demonstrate that the FSC and FHLC positions are within the learned professional exemption. The plaintiffs, therefore, are entitled to overtime pay for hours worked in excess of 40 hours per week.

<u>Method of Calculation</u>

The plaintiffs assert they are entitled to overtime pay calculated at one and one-half times their regular rate of pay; Lakeview, however, maintains they are only entitled to overtime calculated at one-half their regular rate of pay. Ordinarily, overtime pay must be calculated at a rate not less than one and one-half times the employee's regular rate of pay. 29 U.S.C. § 207(a)(1). The "regular rate" is an hourly amount the calculation of which must be discerned from the parties' employment contract. *See* 29 C.F.R. §§ 778.108 &

778.109 (an agency interpretive bulletin).[37] In an early interpretation of the FLSA as originally enacted, the Supreme Court indicated that when the employment contract is for a weekly wage with variable or fluctuating hours, an employee's regular rate of pay is determined by dividing the pay by the number of hours worked in each workweek. *See Overnight Motor Transp. Co. v. Missel*, 316 U.S. 572, 573-74 & 580 n.16 (1942) (superseded by statute on other grounds[38]) ("Wage divided by hours equals regular rate. Time and a half regular rate for hours employed beyond statutory maximum equals compensation for overtime hours."). Consistent with this view, the agency interpretation states that the regular hourly rate is computed by dividing the employee's total compensation for a workweek by the total number of hours actually worked "for which such compensation was paid." 29 C.F.R. § 778.109. The agency applies this computation in one of two ways. First, when an employee is paid a fixed salary for an agreed upon number of hours to be worked each week, the hourly rate "is computed by dividing the salary by the number of hours which the salary is intended to compensate," and all hours worked over 40 are entitled to time and one-half compensation using that regular rate. 29 C.F.R. § 778.113. Second, when an employee is paid a fixed salary for hours that fluctuate from week to week and certain other legal prerequisites are met,[39] the regular

---

[37] Part 778 is an agency interpretive bulletin, rather than a regulation; however "part 778 constitutes the official interpretation of the Department of Labor with respect to the meaning and application of the maximum hours and overtime pay requirements contained in section 7 of the Act." 29 C.F.R. § 778.1. Additionally, 29 C.F.R. § 778.4 provides that "[t]he interpretations of the law contained in this part 778 are official interpretations which may by relied upon as provided in section 10 of the Portal-to-Portal Act of 1947 (61 Stat. 84)." *See* 29 U.S.C. §§ 251-262; *see also Skidmore v. Swift & Co.*, 323 U.S. 134, 139-40 (1944) (stating agency interpretations, while not controlling, are properly resorted to for guidance to the extent of their persuasiveness); *Rodriquez v. Farm Stores Grocery, Inc.*, 518 F.3d. 1259, 1268 n.5 (11th Cir. 2008) (same). The parties here do not challenge the validity of the provisions of Part 778, and accordingly, the court relies on them for guidance to the extent they apply to the facts of this case.

[38] The Court in *Missel* "interpreted the FLSA as originally enacted as allowing the recovery of liquidated damages any time that there was a violation of the Act," and Congress enacted the Portal-to-Portal Act of 1947 to mitigate that harsh interpretation with the good faith defense to liquidated damages. *Trans World Airlines, Inc. v. Thornton*, 469 U.S. 111, 128 n. 22 (1985).

[39] The fluctuating workweek calculation is appropriate where (1) the employee's hours fluctuate from week to week; (2) the employee receives a fixed salary regardless of the number of hours actually worked per

---

hourly rate is computed by dividing the salary by the number of hours actually worked each week and paying only one-half that regular rate as overtime pay. 29 C.F.R. § 778.114(a). The agency interpretation explains that under a fluctuating workweek arrangement, "[s]ince the employee has already received straight-time compensation on a salary basis for all hours worked, only additional half-time pay is due" for the hours worked over 40 hour per week. § 778.114(b).

Courts are divided on the issue of whether the half-rate may be applied to remedy an error of misclassification that arises due to a failed exemption, and the Eleventh Circuit has not yet weighed in on the issue. *Compare, e.g., Torres v. Bacardi Global Brands Promotions, Inc.*, 482 F. Supp. 2d 1379, 1381 & n.3 (S.D. Fla. 2007) (applying the half-rate to remedy a failed exemption and citing cases in support but not relying on the fluctuating workweek method articulated in § 778.114(a)), *with In re Texas Ezpawn Fair Labor Standards Act Litig.*, 633 F. Supp. 2d 395, 401-03 & n.4, n.5 & n.6. (W.D. Tex. 2008) (deciding that time and one-half must be paid, and the fluctuating workweek method is inapplicable in misclassification cases). *See also* DOL Letter Jan. 14, 2009 (FLSA2009-3) (permitting an employer to use the fluctuating workweek method to retroactively pay overtime in a circumstance where no private litigation was pending). *But see Russell v. Wells Fargo and Co.*, No. C 07-3993, 2009 WL 3861764, at *7-8 (N.D. Cal. Nov. 17, 2009) (finding the DOL's January 14, 2009, letter to be unpersuasive because it relied on cases that did not apply the method in a misclassification context or that provided no analysis; also the court found the letter to be contrary to the background and policy of the FLSA). According to the *Torres* case, "[v]irtually every court that has considered the question has upheld the remedial use of half-time in failed exemption cases." 482 F. Supp.2d at 1381

---

week; (3) the fixed amount is sufficient to provide compensation at not less than the minimum wage; (4) there is a clear mutual understanding between employer and employee regarding this arrangement; and (5) the employee receives an overtime payment of not less than one-half his regular rate of pay for hours worked in excess of 40 each week. *See* 29 C.F.R. § 778.114(a); *see Davis v. Friendly Exp., Inc.*, 2003 WL 21488682, at *1 (11th Cir. 2003) (unpublished) (citing 29 C.F.R. § 778.114(a)). The clear mutual understanding required is not an understanding of how overtime pay will be calculated but only an understanding that the salary applies to all hours worked. *See Davis*, 2003 WL 21488682, at *2; *Griffin v. Wake County*, 142 F.3d 712, 716 (4th Cir. 1998).

n.2 (applying the half-rate).  Notwithstanding, the court in *Texas Ezpawn*, surveyed the cases and concluded that in most instances, where courts have applied the half-rate to remedy a miscalculation error, they relied on the fluctuating workweek method but did so without significant analysis of the § 778.114(a) legal prerequisites.  633 F. Supp. 2d at 401-03 (finding the half-rate not applicable).

The court finds it unnecessary to decide in this case whether the fluctuating workweek method may be applied to remedy a misclassification error because the evidence demonstrates that the contract salary was based on a 40-hour workweek and not a fluctuating workweek.  The plaintiffs presented two notice of job opening advertisements for FSC positions which state that the hours of employment were 8 a.m. to 5 p.m., Monday through Friday.  Offer letters Lakeview sent to the plaintiffs stated their annual salary but also included the hourly rate, calculated based on a straight 40-hour week.  Furthermore, the plaintiffs testified that they were expected to be on the job during normal business hours even though they also understood the job might require them to work evenings or weekends.  They testified they were told in their job interviews that flex time would be available to help balance out the evening or weekend time that might be required of them. In practice, however, the plaintiffs testified that they infrequently used flex time because of their job demands.  Sandra Whitaker testified that supervisors were permitted to authorize flex time to permit an employee to come in late if required to work on an evening or weekend.  Though she stated it was not intended to be an hour-for-hour exchange, the court notes that the only reason for permitting flex time is to attempt to keep the hours actually worked close to the 40-hour benchmark – to avoid overtime altogether.  The plaintiffs did not ordinarily work an irregular schedule but were expected to work 8 a.m. to 5 p.m., Monday through Friday, and despite the promise of flex time, they had no expectation that they were permitted to work fewer than 40 hours per week.  For those few weeks when the plaintiffs are documented as working less than 40 hours, it is unclear from the evidence in the record whether they were on flex time, personal leave, vacation time, sick leave, or simply worked less than the requisite hours.  Most weeks, however, the

plaintiffs worked in excess of 40 hours, and they accepted their jobs on the understanding that flex time would be available to keep their hours close to 40 per week. The court finds that the availability of flex time is consistent with a contract for 40 hours a week and inconsistent with a fluctuating workweek. The facts compel a finding that plaintiffs' salary was intended to cover 40 hours a week. Accordingly, plaintiffs are entitled to overtime compensation at one and one-half their regular rate based on a 40-hour workweek.

Willfulness and Good Faith

Any employer who violates the overtime provisions of the FLSA "shall be liable" for the unpaid overtime compensation and an additional equal amount as liquidated damages. 29 U.S.C. § 216(b). This remedy is limited to overtime claims within two years of filing suit, but the statute of limitations may be extended to three years where the employee shows that the employer's violation of the statute was willful. 29 U.S.C. § 255(a).[40] To be entitled to the extended limitation period, the plaintiffs have the burden of demonstrating by a preponderance of the evidence that the FLSA violation was willful, showing that the employer either knew that its conduct was prohibited by the FLSA or exhibited reckless disregard about whether the conduct was prohibited. *See McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1988); Morgan, 551 F.3d at 1280. Reckless disregard in this context is "the 'failure to make adequate inquiry into whether conduct is in compliance with the [FLSA].'" *Morgan*, 551 F.3d at 1280 (quoting 5 C.F.R. § 551.104) (alteration in original and other marks omitted). Thus, a violation may be considered willful when the employer "simply disregarded the possibility that it might be violating the FLSA." *Allen v. Bd. of Pub. Educ. for Bibb County*, 495 F.3d 1306, 1324 (11th Cir. 2007); see also *id.* at 1323 (quoting with approval *Alvarez v. IBP, Inc.*, 339 F.3d 894, 909-10 (9th Cir. 2003), *aff'd*, 564 U.S. 21 (2005)). However, "[i]f an employer acts unreasonably but not recklessly in determining

---

[40] An action for unpaid overtime compensation or liquidated damages under the FLSA "may be commenced within two years after the cause of action accrued, and every such action shall be forever barred unless commenced within two years after the cause of action accrued, except that a cause of action arising out of a willful violation may be commenced within three years after the cause of action accrued." 29 U.S.C. § 255(a).

its legal obligation under the FLSA, then its actions should not be considered willful." *Allen*, 495 F.3d at 1324.

Plaintiffs have shown by a preponderance of the evidence that Lakeview's failure to pay overtime in this instance was willful. Despite Whitaker's and Barrera's testimony that they annually reviewed Lakeview's exempt positions for FLSA compliance and considered the amended regulations and DOL opinion letters, the evidence demonstrates that they ignored the most relevant context and conclusions of the DOL letters on which they purportedly relied and did not make an adequate inquiry into whether the FSC and FHLC positions were exempt. (See, *supra*, this court's earlier discussion regarding Lakeview's determination that the professional capacity exemption applied.) After being twice informed by a DOL Wage & Hour Investigator that the positions were not exempt, Lakeview expended efforts to urge a reevaluation of that conclusion by submitting additional information. Lakeview, however, made no effort to pursue the matter to a final determination. Lakeview did nothing to follow up its submission of additional information or inquire further about whether it was meeting its legal obligation under the FLSA. The last word from the DOL investigator was that the positions did not meet the exemption. Whitaker testified that she assumed Lakeview was in compliance because she heard nothing further from the investigator.[41] Such a head-in-the-sand attitude on Lakeview's part militates in favor of a finding of recklessness. The court concludes that Lakeview

---

[41] The court notes there was also evidence of an informal conversation with an attorney who confirmed Whitaker's and Barrera's understanding of the exemption, but the attorney did not testify and it is unclear what was disclosed to this attorney about the nature of the jobs and the educational requirements; further, Lakeview failed to request a formal opinion regarding its legal obligation from this attorney. *See Alvarez-Perez*, 515 F.3d at 1167-68 (affirming a jury's finding of willfulness despite claims that the employer consulted counsel where there was no evidence what was disclosed to the attorney and the attorney did not testify). *But see Thurston*, 469 U.S. at 130 (finding no willfulness where employer consulted with counsel, met with employees and devised a plan for compliance). The court noted in *Alvarez-Perez* that a fact finder justifiably could be skeptical about an attorney's opinion which is not reduced to writing or otherwise reflected in any document. 515 F.3d at 1168. However, by making this note, the court is not suggesting that it is always necessary to seek a formal opinion in order to avoid a finding of willfulness. Here, after considering the totality of the circumstances, the court finds more persuasive the other evidence indicating Lakeview disregarded not only the opinion of a DOL investigator but also the most relevant portions of the DOL opinion letters on which it purportedly relied.

recklessly "disregarded the *possibility* that it might be violating the FLSA," *Allen*, 495 F.3d at 1324, and thus the three-year statute of limitations pursuant to 29 U.S.C. § 255(a) is applicable.

Ordinarily, the court must add an award of liquidated damages equal to the overtime pay when the employer has violated the FLSA overtime provisions. 29 U.S.C. § 216(b); *Morgan*, 551 F.3d at 1282. To avoid liquidated damages, the employer has the burden of demonstrating that its failure to pay overtime was done in good faith and with reasonable grounds for believing that the failure to pay was not a violation of the FLSA; and if the employer establishes both objective and subjective components of the good faith defense, the district court has discretion to reduce or eliminate the liquidated damages that otherwise would be required. *See* 29 U.S.C. § 260; 29 C.F.R. § 790.22; *Morgan*, 551 F.3d at 1282; *see also Alvarez-Perez v. Sanford-Orlando Kennel Club, Inc.*, 515 F.3d 1150, 1163 (11th Cir. 2008); *Dybach*, 942 F.2d at 1566-67. The employer bears a substantial burden to demonstrate good faith because "double damages are the norm, single damages the exception." *Kinney v. Dist. of Columbia*, 994 F.2d 6, 12 (D.C. Cir. 1993) (internal marks omitted); *see also Alvarez*, 339 F.3d at 910 (describing this as a "difficult burden" (internal marks omitted)). "Liquidated damages are mandatory absent a showing of good faith." *Spires v. Ben Hill County*, 980 F.2d 683, 689 (11th Cir. 1993).

Because the plaintiffs have prevailed in proving that the violation in this instance was willful, Lakeview cannot prevail on its difficult burden of demonstrating good faith. "[T]o find 'good faith' after a finding of 'willful' violation is illogical." *Alvarez-Perez*, 515 F.3d at 1166 (internal marks omitted) (holding a jury's finding of willfulness on the statute of limitations issue precluded the court from making the inconsistent finding that the employer acted in good faith on the liquidated damages issue). Accordingly, for the same reasons that support the court's finding of a willful violation, the court finds that Lakeview did not act in good faith. Thus, the court will award liquidated damages as prescribed by statute.

## Conclusion

For the reasons set forth above, the court finds in favor of plaintiffs on their FLSA

overtime claim and awards overtime compensation at a rate of one and one-half times the plaintiffs' regular hourly rate based on a 40-hour workweek. The court finds Lakeview's FLSA violation to be willful, and therefore, plaintiffs are entitled to compensation for claims of unpaid overtime that occurred within three years of the commencement of this suit. Additionally, the court finds that Lakeview has failed to establish a good faith defense to liquidated damages, and therefore, plaintiffs are entitled to an award of liquidated, or double, damages.

Accordingly, it is hereby ORDERED:

1.     Judgment is entered in favor of plaintiffs and against defendant in the amount of $147,240.15,[42] to be divided among the plaintiffs as follows:

        a.     Stephen Talbott, Jr., $10,047.04

        b.     Kristin Webb, $37,801.81

        c.     Sharon Oakes, $28,235.65

        d.     Erica Roberts, $15,588.51

        e.     Stacy D. Kirksey, $20,840.52

        f.     Callie Gray-Bobbitt, $21,385.43

        g.     Beth Maroon, $13,341.19

2.     The clerk shall tax costs against defendant.

**DONE AND ORDERED** this 2nd day of February, 2010.

_s/ M. Casey Rodgers_

**M. CASEY RODGERS**
**UNITED STATES DISTRICT JUDGE**

---

[42] The award is based on the parties' Joint Exhibits 1 through 7, detailing hours the plaintiffs worked in excess of 40 each week and their salaries based on a 40-hour workweek, as well as the addendum to plaintiffs' proposed findings of fact and conclusions of law. Based on the court's calculation, however, the total judgment reflected in the addendum is in error and the court's judgment has corrected that calculation. To the extent the parties determine there are any miscalculations in the amount of the award, they may file objections to correct the amounts within ten days of the judgment.

Case No. 3:06cv378/MCR/MD